UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| ESTATE OF ANTRON PEARSON, | ) | |
| by its Personal Representative | ) | |
| Barbara D. Pearson, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | CAUSE NO. 1:13-CV-332 RLM |
| | ) | |
| CITY OF FORT WAYNE, INDIANA, and | ) | |
| OFFICER JOSHUA FRANCISCY, in | ) | |
| his individual and official capacities, | ) | |
| | ) | |
| Defendants | ) | |

## OPINION and ORDER

This cause is before the court on the motion of the City of Fort Wayne, Indiana and Officer Joshua Franciscy for summary judgment on the claims of the Estate of Antron Pearson. Also pending is the defendants' motion to strike the exhibits submitted by the Estate in support of its summary judgment response. For the following reasons, the court denies the motion to strike and grants the summary judgment motion.

### FACTS

The Estate hasn't set forth its version of the facts of this case or a statement of genuine disputes as required by Rule 56.1(b)(2) of the Local Rules of the United States District Court for the Northern District of Indiana. Fortunately, the record

contains a discussion of the facts and issues sufficient to allow a ruling on the summary judgment motion.

The events in this case revolve around actions in the early morning hours of November 26, 2011 outside Broadway Joe's, a bar in Fort Wayne, Indiana. Officers of the Fort Wayne Police Department were in the area of the bar when they heard gunfire. In the process of the investigation undertaken by three Fort Wayne police officers on the scene, Officer Joshua Franciscy shot and killed Antron Pearson outside Broadway Joe's. The Estate alleges in its complaint that the shooting was unjustified in that Mr. Pearson was unarmed and posed no threat to police officers or others at the scene.

The Estate filed suit in this court naming as defendants the City of Fort Wayne, Indiana, and Officer Joshua Franciscy, in his individual and official capacities. The Estate's claims, brought pursuant to 42 U.S.C. § 1983, are that Officer Franciscy's actions amounted to excessive force in violation of Mr. Pearson's Fourth and Fourteenth Amendment rights, and the City of Fort Wayne violated Mr. Pearson's rights by failing to properly train and supervise its employees. The Estate also asserts state law claims under the Indiana Tort Claims Act, IND. CODE § 34-13-3-1 *et seq.*, and Indiana's Wrongful Death Act, IND. CODE § 34-23-1-1 *et seq.*, against Officer Franciscy for wrongful death, the City of Fort Wayne for negligence, and both defendants for assault and battery and intentional infliction of emotional distress. The Estate also alleges liability by the Fort Wayne

Police Department (an entity not named as a defendant in this action) in its claims for failure to train and supervise, negligence, and intentional infliction of emotional distress.

The defendants dispute the Estate's version of the facts, and Officer Franciscy and the City of Fort Wayne have moved for summary judgment on all claims of the Estate's complaint.

MOTION TO STRIKE

The City and Officer Franciscy have moved to strike the Allen County Coroner's Report and the Postmortem Examination Amended Final Report submitted by the Estate in support of its summary judgment response. The defendants say that because those reports are unsworn and unauthenticated, they constitute hearsay documents that are inadmissible in a summary judgment proceeding. The Estate hasn't filed a response to the motion to strike, and the time for doing so has passed.

Federal Rule of Civil Procedure 56, as amended, provides that materials submitted in response to a motion for summary judgment need only be capable of being presented in a form admissible at trial. *See* FED. R. CIV. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). While the Estate's submissions aren't verified or authenticated, the documents appear to be business

records or public records capable of being presented in a form that would be admissible at trial. *See* FED. R. EVID. 803(6, 8); <u>United States v. Given</u>, 164 F.3d 389, 394 (7th Cir. 1999) ("A party establishes a foundation for admission of business records when it demonstrates through the testimony of a qualified witness that the records were kept in the course of regularly conducted business activity, and that it was the regular practice of that business to make such records."). In the interest of justice, then, the court will deny the motion to strike and consider the records submitted by the Estate.

SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986). In deciding whether a genuine issue of material fact exists, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986); <u>Weigle v. SPX Corp.</u>, 729 F.3d 724, 730 (7th Cir. 2013). The existence of an alleged factual dispute, by itself, won't defeat a

summary judgment motion; "instead, the nonmovant must present definite, competent evidence in rebuttal," Parent v. Home Depot U.S.A., Inc., 694 F.3d 919, 922 (7th Cir. 2012), and "must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." Hemsworth v. Quotesmith.com, Inc., 476 F.3d 487, 490 (7th Cir. 2007); *see also* Fed. R. Civ. P. 56(e)(2). "[S]ummary judgment is 'not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." Steen v. Myers, 486 F.3d 1017, 1022 (7th Cir. 2007)*(quoting* Hammel v. Eau Galle Cheese Factory, 407 F.3d 852, 859 (7th Cir. 2005)).

Discussion

To prevail under 42 U.S.C. § 1983, the Estate must establish that (1) Mr. Pearson had a constitutionally protected right, (2) he was deprived of that right, (3) Officer Franciscy intentionally caused that deprivation, and (4) Officer Franciscy acted under color of state law. Forrest v. Prine, 620 F.3d 739, 743 (7th Cir. 2010). The first and fourth elements aren't at issue here. A police officer's use of deadly force constitutes a seizure within the meaning of the Fourth Amendment, Tennessee v. Garner, 471 U.S. 1, 7 (1985); McKinney v. Duplain, 463 F.3d 679, 684 (7th Cir. 2006), and the parties don't dispute that Officer Franciscy was acting under color of state law. The defendants do, however, challenge the

Estate's claims that Officer Franciscy's actions were "without legal justification or provocation and constitute[d] an unreasonable seizure of [Mr.] Pearson's person, an unconstitutional use of excessive force, and cruel and unusual punishment without due process of law." Compl., ¶ 29. The parties' arguments on the Estate's claims that Officer Franciscy violated Mr. Pearson's constitutional rights are addressed below.

## A. Excessive Force

The first consideration is what analysis governs the Estate's claim of a constitutional violation. *See* Graham v. Connor, 490 U.S. 386, 393 (1989) ("In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force."). "The scope of an individual's right to be free from punishment – and, derivatively, the basis for an excessive force action brought under § 1983 – hinges on his status within the criminal justice system." Lewis v. Downey, 581 F.3d 467, 473 (7th Cir. 2009). Cases in this circuit establish that "the protections of the Fourth Amendment apply at arrest and through the [] probable cause hearing, [Fourteenth Amendment] due process principles govern a pretrial detainee's conditions of confinement after the judicial determination of probable cause, and the Eighth Amendment applies following conviction." Lopez v. City of Chicago, 464 F.3d 711, 719 (7th Cir. 2006); *see also* Ortiz v. City of

Chicago, 656 F.3d 523, 530 (7th Cir. 2011) ("Because [decedent] had not yet benefitted from a judicial determination of probable cause, . . . we agree that the Fourth Amendment applies."); Luck v. Rovenstine, 168 F.3d 323, 326 (7th Cir. 1999) ("There is, to be sure, a difference between the constitutional provisions that apply to the period of confinement before and after a probable cause hearing: the Fourth Amendment governs the former and the Due Process Clause the latter."). No probable cause hearing had taken place, so a Fourth Amendment standard governs the Estate's excessive force claim .

"[T]he Fourth Amendment prohibits the use of excessive force during the execution of a seizure. . . . [T]o decide whether the amount of force used during a seizure is 'excessive,' [the court must] examine the totality of the circumstances to determine whether the intrusion on the citizen's Fourth Amendment interests was justified by the countervailing government interests at stake." Jacobs v. City of Chicago, 215 F.3d 758, 773 (7th Cir. 2000). A claim that a police officer used excessive force to effect a seizure is governed by the Fourth Amendment's "reasonableness" standard, Plumhoff v. Rickard, ___ U.S. ___, ___, 134 S. Ct. 2012, 2020 (2014), *i.e.*, whether the officer's actions were "'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." Graham v. Connor, 490 U.S. 386, 395, 397 (1989).

In deciding whether the amount of force used was reasonable, a court must consider the severity of the crime at issue; whether the suspect posed an immediate threat to the safety of officers or others; and whether the suspect was actively resisting arrest by flight. McAllister v. Price, 615 F.3d 877, 881 (7th Cir. 2010). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and must take into consideration the fact that "police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. at 396-397. Thus, Officer Franciscy's liability must be based "exclusively upon an examination and weighing of the information [he] possessed immediately prior to and at the very moment he fired the fatal shot." Sherrod v. Berry, 856 F.2d 802, 805 (7th Cir. 1988) (*en banc*).

The defendants say Officer Franciscy's actions on the night in question were reasonable under the circumstances: Officer Franciscy believed Mr. Pearson intended to shoot him so Officer Franciscy had no recourse but to defend himself and prevent injury to himself and others in the area. In support, the defendants have submitted affidavit statements from Officer Franciscy and three other officers who were present at the scene of the shooting. Those affidavits all relate to the events at issue in the early morning hours of November 26, 2011 and report as follows.

*Officer Joshua Franciscy*

Officer Franciscy, a Fort Wayne police officer since October 2007, says that while he was patrolling the southwest area of Fort Wayne on the night in question, he received information from fellow officer Craig Wise about a large crowd at Broadway Joe's, a bar in the city. Deft. Exh. A (Franciscy Aff.), ¶¶ 2-5. Officer Franciscy says he knew police had been called to Broadway Joe's many times in the past based on reports of fights, intoxicated individuals, domestic problems, drugs, and shots fired, so he and Officer Wise decided to drive to the area of the bar to observe the outside crowd. Franciscy Aff., ¶¶ 4, 6. Officer Franciscy adds that about fifteen to twenty minutes before he got to the bar, he received a radio report that an Allen County officer reported that five or six shots had been fired approximately one block from Broadway Joe's. Franciscy Aff., ¶ 7.

Officer Franciscy says that when he arrived at Broadway Joe's, he parked his vehicle on the street with a clear view of the bar's parking lot, and he immediately heard a shot fired. Franciscy Aff., ¶ 8. Another officer in the vicinity, Chris Hoffman, was driving by the bar at that same time and confirmed to Officer Franciscy via radio that he also heard a shot fired. Franciscy Aff., ¶¶ 9-10. Officer Franciscy radioed to Officers Wise and Hoffman that he was going to approach the area on foot, while at the same time Officer Wise pulled his vehicle into the parking lot on the south side of Broadway Joe's. Franciscy Aff., ¶¶ 10-11.

Officer Franciscy says Officer Wise radioed that he had just seen a black man, wearing a red hat, running around the corner of the bar. Franciscy Aff., ¶ 12. Officer Franciscy then saw a man fitting that same description come around the corner of the bar, "walking very fast." Franciscy Aff., ¶ 13. Officer Franciscy yelled at the man several times, "Let me see your hands," but the man failed to comply. Franciscy Aff., ¶ 14. Officer Franciscy reports that at that time, he saw that the man had a gun in his right hand, so he yelled repeatedly, "Drop the gun," but, again, the man failed to comply with the officer's commands, even though Officer Franciscy was in full uniform and had his firearm drawn in front of him. Franciscy Aff., ¶ 15. According to Officer Franciscy,

> [t]he male subject started to hide the gun behind his leg. The male subject then took a shooting stance. At that point, I believed that the male subject was going to shoot me or flee the scene and shoot another officer in the area. I had no cover or concealment. I feared for my life. I was in imminent danger. I also feared for the safety of Officer Wise and the people standing outside of Broadway Joe's. I believed that the male subject, later identified as Antron Pearson, intended on shooting me. I had no recourse but to defend myself. In self-defense, I discharged my firearm at the suspect to stop him. The subject fell to the ground. I believed that it was necessary to discharge my firearm to save my own life and/or to prevent serious bodily harm to myself as well as others in the area.

Franciscy Aff., ¶¶ 16-20.


*Officer Craig Wise*

Officer Wise, a Fort Wayne police officer since May 2003, reports that on November 26, 2011, he was in full uniform, patrolling the southwest side of Fort

Wayne in a marked squad car. Defts. Exh. B (Wise Aff.), ¶¶ 2-3. Officer Wise says he was familiar with previous police calls to Broadway Joe's, so he and Officer Franciscy agreed to drive to that area and observe the activity outside the bar. Wise Aff., ¶ 4-5. Officer Wise says that when he got there, he parked his squad car on the street with a full view of the bar and its parking lot, and while sitting in his car he heard what he believed to be gunfire coming from the area of the bar. Wise Aff., ¶¶ 6-8. Officer Wise says Officer Chris Hoffman was driving by the bar at that same time, and Officer Hoffman relayed on the radio that he had just seen a black man, wearing black, in the alley next to the bar. Wise Aff., ¶¶ 9-10. Officer Wise reports that he drove into the parking lot next to the bar and saw Officer Hoffman make a U-turn and drive back in front of Broadway Joe's and Officer Franciscy exit his squad car on foot. Wise Aff., ¶¶ 11-13. Officer Wise says that as he drove through the parking lot toward the rear of Broadway Joe's, he spotted a black man, dressed in black and wearing a red baseball cap, crouched down near the rear exit of the bar. Wise Aff., ¶ 14. According to Officer Wise, when the man saw him, he looked startled and began to move around the corner of the bar; Officer Wise immediately radioed to the other officers, "He's round back, running in front now, red hat, male, black shirt." Wise Aff., ¶¶ 16-17.

Officer Wise reports that he heard gunshots as he was backing up in the parking lot. Wise Aff., ¶ 19. He says he got out of his car, ran to the front of Broadway Joe's, and ordered the people standing in front of the bar to get down

on the ground because he didn't know where the gunshots had come from. Wise Aff., ¶¶ 20-22. Officer Wise says he then saw the black man he had previously seen crouched behind the bar lying in the parking lot, with a firearm on the ground in close proximity to the man's right hand. Wise Aff., ¶¶ 23-24. Officer Franciscy was in the parking lot, as well. Wise Aff., ¶ 23. Lastly, Officer Wise says he walked into the alley south of Broadway Joe's and located a spent shell casing. Wise Aff., ¶ 25.

*Officer Chris Hoffman*

Officer Hoffman began his career as a Fort Wayne Police Officer in August 2002. Defts. Exh. C (Hoffman Aff.), ¶ 2. Officer Hoffman reports that he was patrolling on the southwest side of Fort Wayne on November 26, 2011, and intentionally drove to the area of Broadway Joe's because "there are typically problems that arise at that location on weekend nights." Hoffman Aff., ¶ 5. Officer Hoffman says that as he drove by the bar, he saw Officer Wise parked in his squad car watching the parking lot of the bar. Hoffman Aff., ¶ 6. According to Officer Hoffman, he heard what he believed to be a gunshot as he passed the bar; he then confirmed to Officer Franciscy via radio that he had heard a gunshot. Hoffman Aff., ¶¶ 8-9. Officer Hoffman says that while he was on the radio with Officer Franciscy, he saw a black man dressed in black bent over in the alley south of Broadway Joe's: "I immediately made a U-turn as I believed that the male subject

may have been involved in the shot fired. I believed that the gunshot had come from either right at Broadway Joe's or behind Broadway Joe's." Hoffman Aff., ¶¶ 10-11. Officer Hoffman reports that once he made the U-turn, the man he previously observed was no longer in the alley, so he radioed to the other officers that he had seen a black man in a black shirt in the alley next to the bar, but the man wasn't there any longer; Officer Hoffman reports further that "[a]t that point, I felt even stronger that the male subject that I had observed in the alley was involved in the shot fired." Hoffman Aff., ¶ 12.

Officer Hoffman says he saw Officer Wise in his squad car at the back of Broadway Joe's and heard Officer Wise radio that he could see the black man at the rear of the bar and that the man had begun to run toward the front of the bar. Hoffman Aff., ¶¶ 14-15. Officer Hoffman says he heard several gunshots, and immediately drove to the front of the bar where he saw a man lying on the ground and Officer Franciscy standing nearby. Hoffman Aff., ¶¶ 16-17. Officer Hoffman observed a handgun lying of the ground "approximately two feet above the subject." Hoffman Aff., ¶ 18. He photographed the area, including the handgun lying on the ground close to the man, and later discovered a shell casing in the same area where he had seen the male subject immediately after hearing the gunshot; Officer Hoffman says the clothing on the man on the ground was "consistent" with the clothing worn by the man he observed in the alley next to Broadway Joe's. Hoffman Aff., ¶¶ 19-20.

*Sergeant Jon Bowers*

Sergeant Bowers, an officer with the Fort Wayne Police Department since April 1994, was a crime scene supervisor on November 26, 2011. Defts. Exh. D (Bowers Aff.), ¶ 2. Sgt. Bowers says that when he responded to the shooting scene at Broadway Joe's, he learned that Officer Franciscy had confronted and shot an armed male in the parking lot on Broadway Street. Bowers Aff., ¶ 4. Sgt. Bowers says he observed Antron Pearson lying in the parking lot, with his right arm extended away from his body and a black colored semi-automatic handgun on the ground two feet from his hand. Bowers Aff., ¶ 5. According to Sgt. Bowers, in the photograph attached to his affidavit "Antron Pearson's right hand appears to be in the shape of a hand that is gripping a handgun. The shape of Antron Pearson's right hand is consistent with Antron Pearson gripping the gun with his right had just before he was shot. This is exactly how Antron Pearson's right had appeared when I saw him lying on the parking lot." Sgt. Bowers says, too, that the location of the gun "is also consistent with Antron Pearson gripping the gun with his right hand just before he was shot." Bowers Aff., ¶¶ 7-8.

*William J. Everett*

The defendants also rely on an expert report from William J. Everett, who examined and reviewed materials relevant to the shooting incident. Mr. Everett reports that he is a former police officer and attorney who provides training to

local, state, and federal law enforcement officers relating to human behavior in dynamic, high stress circumstances; Mr. Everett also develops law enforcement training programs for police officers in Minnesota and served on a committee to revise Minnesota's statewide policy on the use of force. Defts. Exh. E, Exh. 1 (Everett Curriculum Vitae). Mr. Everett prepared his expert report based his review and consideration of the following materials: the complaint and answer; the Allen County coroner's report; the amended final report of postmortem examination; the crime scene management technician's report; diagram and measurements from the scene; narrative reports from twenty-four individuals; internal affairs case report with notes; shooting investigation team report; investigation report by multiple authors; transcript of November 30, 2011 interview with Officer Franciscy; video deposition of Kevin Boughton; satellite image of area of Broadway Joe's; photographs from the scene; a video recording from the scene; video interviews with four Fort Wayne police officers; mobile video recording from Officer Franciscy's patrol car; and recordings of police radio traffic. Defts. Exh. E (Exh. 1), at 1-3.

In his report, Mr. Everett reviewed the events of the early morning hours of November 26, 2011, Defts. Exh. E (Exh. 1), at 3-5; compiled a time-line surrounding the shooting incident, Defts. Exh. E (Exh. 1), at 5-6; and set forth the following conclusions:

(1) "A reasonable officer would have concluded that [Mr.] Pearson posed an imminent threat of death or serious physical injury." Defts. Exh. E (Everett Rept.), at 7.

Mr. Everett opined that the background information known to the officers involved in this incident – officers being alerted to shots fired in the vicinity of Broadway Joe's, another gunshot coming from the rear of the bar, officers' observations of a man, first, in the alley next to the bar, next, crouched behind the bar, and lastly, running toward the front of the bar, and Officer Franciscy's learning of those actions as the man rounded the corner of the bar – "became the lens through which a reasonable officer in [Officer] Franciscy's position would have assessed [Mr.] Pearson's actions in the parking lot. It also would have informed a reasonable officer as to what behaviors to anticipate. Information about gunshots being fired within the previous half-hour would have alerted reasonable officers to be actively vigilant for armed individuals. Hearing a gunshot in the area of Broadway Joe's a minute or so before encountering [Mr.] Pearson would have signaled an active shooting situation; i.e., the presence of an individual in the immediate area who was armed and firing his gun. Seeing Mr. Pearson round the corner of Broadway Joe's concurrently with hearing Officer Wise's broadcast would indicate a strong risk that [Mr.] Pearson was indeed the individual who had fired a gun a minute or so earlier." Everett Rept., at 7-8.

Mr. Everett found that based on Mr. Pearson's actions of disregarding Officer Franciscy's verbal commands to show his hands and drop his weapon, responding instead by moving the gun behind his leg, and then moving into a "bladed, shooting stance," no officer could know what Mr. Pearson intended to do next. According to Mr. Everett, "officers must necessarily rely on pattern recognition to assess the threat. [Mr.] Pearson's actions . . . would have been reasonably recognized as aligning with and then extending forward a pattern of events signaling that an armed assault was imminent." Everett Rept., at 8. Mr. Everett says a reasonable officer in those circumstances "would believe that [Mr.] Pearson had fired the gun he was holding in his hand only a minute before" his encounter with Officer Franciscy. Everett Rept., at 8. Mr. Everett concluded that Mr. Pearson's actions "in making eye contact with Officer Franciscy and orienting himself in a bladed shooting stance toward [Officer Franciscy] would leave a reasonable officer believing that [Mr.] Pearson was making ready to fire his gun again and that [Officer] Franciscy was the intended target." Everett Rept., at 8.

(2) "A reasonable officer would have concluded that the use of deadline force was immediately necessary to counter the threat posed by [Mr.] Pearson." Everett Rept., at 8.

Mr. Everett stated that after Officer Franciscy saw that Mr. Pearson had a gun in his hand and moved into what Officer Franciscy recognized as a shooting stance, "[i]t would be reasonable for one in [Officer] Franciscy's position to expect that [Mr.] Pearson could fire a first shot at him in less than half a second from initiating the first physical movement involved in raising a gun to shoot. A reasonable officer would understand that waiting to detect the suspect moving his gun, before firing defensively, would almost inevitably allow the suspect to shoot first. Once [Officer] Franciscy observed that [Mr.] Pearson moved into a bladed shooting stance, a reasonable officer in [Officer's] Franciscy's position would understand – because action is faster than reaction – that he had no margin of safety that allowed him to wait before taking action." Everett Rept., at 9.  Mr. Everett then concluded that a reasonable officer in the circumstances faced by Officer Franciscy "would have believed that he faced an imminent threat of significant physical harm, and that the use of deadly force was necessary to counter that threat." Everett Rept., at 9.

The defendants lastly point to the holding in <u>Tennessee v. Garner</u>, 471 U.S. 1 (1985), as support for their position that Officer Franciscy's actions were reasonable under the circumstances:

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to

others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

471 U.S. at 11-12.

The defendants say the evidence shows that Officer Franciscy warned Mr. Pearson to raise his hands and drop his gun but Mr. Pearson didn't comply, so when Mr. Pearson took a shooting stance, Officer Franciscy believed Mr. Pearson intended to shoot him, leaving Officer Franciscy with no recourse but to defend himself. Under the totality of the circumstances, the defendants conclude, Officer Franciscy's actions were reasonable and didn't amount to a violation of Mr. Pearson's Fourth Amendment rights.

The Estate responds that the facts and physical evidence in this case directly contradict the affidavit statements of the officers at the scene. The Estate says that (1) the coroner's report, submitted as an exhibit to the response, "concludes that the victim was shot in the back of the head," contradicting the defendants' claim that the officer fired after Mr. Pearson took a shooting stance; (2) the post-shooting photographs show Mr. Pearson wearing clothing that made concealment of an automatic pistol the size and weight of the one shown in the photograph a difficult thing to do in a public venue; (3) witnesses observed Mr. Pearson dancing and singing while wearing the same clothing before the shooting and described him as unarmed; (4) neither the defendants nor their expert claim

that the time-stamped video of Mr. Pearson leaving the bar show him holding a firearm; (5) neither the defendants nor their expert claim that the pistol purportedly carried by Mr. Pearson was observed at any point on the time-stamped video; and (6) Mr. Everett's expert report doesn't "contain any explanation as to how someone who had assumed a 'kind of bladed shooting stance' facing the shooting officer and making direct eye contact with that officer ended up being shot twice with bullet trajectories starting from behind the right ear and traveling toward the left eye." Resp., at 1-2. The Estate concludes that "[o]bviously, this is a material fact in dispute which is determinative of the issue of whether a constitutional right was violated." Resp., at 2. The court can't agree.

First, the Estate hasn't specified the facts or physical evidence to which it refers. None of the generalized statements in its response brief – that Mr. Pearson's clothing wasn't conducive to carrying a concealed weapon, unnamed witnesses described Mr. Pearson as unarmed, and no one claims the time-stamped video shows Mr. Pearson holding a firearm – establish a dispute as to a genuine issue of material fact. *See* <u>Hahn v. Macklin</u>, No. IP 99-1763, 2002 WL 243642, at *2 n.2 (S.D. Ind. Jan. 4, 2002) ("Hahn's unsupported factual assertions do not raise genuine issues of material fact for trial."). The defendants have presented photographic evidence of the shooting scene showing a gun located on the ground about two feet from Mr. Pearson's hand. *See* Defts. Exh. D (Bowers Aff.), Exh. 1. The Estate hasn't challenged that photograph. The

defendants produced an affidavit statement by Officer Franciscy that Mr. Pearson pointed a gun at him, Defts. Exh. A, ¶ 17, affidavit statements by Officers Wise and Hoffman that they both saw a firearm lying on the ground close to Mr. Pearson's right hand, Defts. Exh. B, ¶ 23 & Exh. C, ¶ 18, and Officer Bowers' affidavit statement that a black semi-automatic handgun was found on the ground approximately two feet from Mr. Pearson's hand, Bowers Aff., ¶ 5. The Estate hasn't challenged any of those statements or set forth any evidence tending to call the credibility of the officers' affidavit statements into question. *See* Roos v. Patterson, No. 10-4073, 2013 WL 3899966, at *1 (C.D. Ill. July 29, 2013) ("If the opponent of the motion believes that there is additional evidence that is pertinent to the questions raised, it is incumbent on the opponent to direct the court to that evidence.").

The Estate has provided no citations to the specific page(s) or line(s) in the either coroner's report to show that Mr. Pearson sustained two gunshots and was shot in the back of the head. An examination of the exact language of the documents submitted and relied upon by the Estate shows that the Allen County Coroner's Report lists Mr. Pearson's cause of death as a "gunshot wound of the head," and the Postmortem Examination Amended Final Report lists the cause of death as a "Single Gunshot Wound to the Head," Rept., at 1, and sets forth the following findings with respect to the autopsy of Mr. Pearson's "cranial cavity:" "There is a single entrance gunshot wound of the right mid temporal/parietal

scalp." Rept., at 4. In addition, the Postmortem Report identifies the gunshot's entrance wound being in the "right mid temporal/parietal scalp with no stippling or soot indicting distant range (no exit would identified)," Rept., at 1. The court's research of those terms is in agreement with that of the defendants. *See* Reply, at 5 n.2. Webster's Third New International Dictionary (2002) defines "temporal" (on page 2353) as "of or relating to the temples or sides of the skull," and the American Medical Association's Complete Medical Encyclopedia (2003) defines "parietal bone" (on page 957) as "either of a pair of bones that form the top and sides of the cranium" and "parietal lobe" as "one of the major divisions of the brain [that] is located just beneath the top of the skull." Thus, the reports relied on by the Estate provide no support for its claim the coroner concluded that Mr. Pearson was shot twice and was shot in the back of the head. *See* Curtis v. Wilks, 704 F. Supp. 2d 771, 787 (N.D. Ill. 2010) (deeming arguments waived where party failed "to rely on an properly supported fact statement in the summary judgment record); *cf.* Tremper v. Air-Shields, Inc., No. IP 00-1080, 2003 WL 182954, at *4 (S.D. Ind. Jan. 24, 2003) ("Tremper cites materials in support of his assertions that directly contradict the statements they are offered to support.").

The Estate also claims in its response brief that "[t]his disputed issue of fact rises to the level of perjury in an ongoing cover-up as to events at the time of the shooting." Resp., at 2-3. The Estate hasn't designated the specific disputed issue of fact relied upon in its allegation nor has it produced any evidence of perjury or

an "ongoing cover-up" beyond the unsupported statement in the response brief. The Estate's allegation "is just unsupported conjecture, which has no place in our summary judgment analysis." Kozuszek v. Brewer, 546 F.3d 485, 488 (7th Cir. 2008). Perjury is a crime; one who accuses an opponent of a crime should at least accompany the accusation with a hint of where proof of the crime is to be found. No such hint accompanied the Estate's brief.

Lastly, the Estate requests that it be afforded "the opportunity to establish the violation of a 4th amendment right by allowing a jury to determine the credibility of the opposing witnesses and the physical at a trial by jury." Resp., at 4-5. As already noted, summary judgment is the "'put up or shut up' moment in litigation," which means that "the non-moving party is required to marshal and present the court with the evidence [it] contends will prove [its] case. And by evidence, we mean evidence on which a reasonable jury could rely." Goodman v. National Sec. Agency, Inc., 621 F.3d 651, 654 (7th Cir. 2010); see also FED. R. CIV. P. 56(c); Diadenko v. Folino, 741 F.3d 751, 757-758 (7th Cir. 2013) ("As we have said before, summary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events."); Moss-Buchanan v. City of Chicago, No. 03 C 999, 2005 WL 78953, at *5 (N.D. Ill. Jan. 14, 2005) ("Conclusory statements, unsupported by the evidence of record, are insufficient to avoid summary

judgment."). The Estate hasn't carried its burden of producing evidence to support its position and further opportunity to do so isn't an option.

"If an officer believes that the suspect's actions place him, or others in the immediate vicinity, in imminent danger of death or serious bodily injury, deadly force can reasonably be used." DeLuna v. City of Rockford, Ill., 447 F.3d 1008, 1010 (7th Cir. 2006); *see also* Bell v. Irwin, 321 F.3d 637, 639 (7th Cir. 2003) ("We have held that if the suspect threatens the officer with a weapon, the risk of serious physical harm to the officer or others has been established."). Based on a consideration of the totality of the circumstances of this case, the factors set forth in McAllister v. Price, 615 F.3d 877, 881 (7th Cir. 2010) – Mr. Pearson was suspected of firing shots in a crowded area outside a bar in Fort Wayne, he posed an immediate threat to the safety of the officers or others when he took a firing stance and pointed a firearm at a police officer, and he was actively resisting arrest when he refused to comply with officer's commands to show his hands and drop his weapon – and the Estate's failure to point to facts or produce evidence tending to show that Mr. Pearson didn't point his weapon at Officer Franciscy, the court concludes that the undisputed facts are sufficient to establish imminent danger to Officer Franciscy that would render deadly force reasonable. Thus, because the Estate hasn't designated facts or evidence from which a reasonable jury could conclude that Officer Franciscy violated Mr. Pearson's Fourth

Amendment rights, the defendants are entitled to summary judgment on the Estate's excessive force claim.

## B. Qualified Immunity

The defendants next argue that, even if Mr. Pearson's Fourth Amendment rights were violated, Officer Franciscy is still entitled to summary judgment on the Estate's excessive force claim because he is protected by qualified immunity. Resolution of the issue of qualified immunity requires the court to consider whether the facts, considered in the light most favorable to Mr. Pearson, show that Officer Franciscy's conduct violated Mr. Pearson's constitutional rights; if a constitutional right was violated, the court must decide if that right was clearly established at the time of the alleged injury, such that a reasonable officer would understand that his actions were in violation of that right. Saucier v. Katz, 533 U.S. 194, 201-202 (2001); Findlay v. Lendermon, 722 F.3d 895, 899 (7th Cir. 2013).

The Estate says in its response that it is alleging "4th Amendment violations because the deceased was a victim of excessive force resulting in death. Qualified immunity is not a defense." Resp., at 4. The Estate's conclusion, "lacking sufficient competent evidence to support [it], [is] insufficient to avoid summary judgment. A court's 'favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture.'" Gray v. City of

Hammond, 693 F. Supp. 2d 823, 834 (N.D. Ind. 2010) (*quoting* Singer v. Raemisch, 593 F.3d 529, 533 (7th Cir. 2010)). As the court concluded above, no violation of a constitutional right has been shown, so Officer Franciscy is entitled to qualified immunity.

## C. Failure to Train and Supervise

Count II of the Estate's complaint that the City of Fort Wayne and the Fort Wayne Police Department had a duty to properly train and supervise police officers in (a) the proper use of force, (b) the proper procedures for detaining suspects, and (c) the proper methods for effecting an arrest, and the City and the police department breached that duty. Compl., ¶¶ 32-33. The defendants have moved for summary judgment on this claim because, the defendants say, the Estate hasn't alleged any misconduct, other than the incident at issue in this case, that would have alerted the City that further training and supervision of its officers was necessary, and the Estate can't establish that Fort Wayne police officers violate citizens' constitutional rights so often that the need for further training was obvious.

Because a municipality can't be liable under § 1983 on a *respondeat superior* theory, Jenkins v. Bartlett, 487 F.3d 482, 492 (7th Cir. 2007) (*citing* Monell v. Department of Social Servs., 436 U.S. 658, 694 (1978)), the City of Fort Wayne can only be liable if "the deprivation of constitutional rights is caused by

its own policy or custom." <u>Walker v. Sheahan</u>, 526 F.3d 973, 977 (7th Cir. 2008); *see also* <u>Board of County Comm'rs of Bryan County, Okla. v. Brown</u>, 520 U.S. 397, 415 (1997) ("Congress did not intend municipalities to be held liable unless deliberate action attributable to the municipality directly cause a deprivation of federal rights."). To prevail, the Estate must establish that Mr. Pearson's constitutional rights were violated, the City of Fort Wayne had a policy or custom of failing to train and supervise its officers, and the City's failure to train and supervise caused the constitutional violation at issue. <u>Monell v. Department of Social Servs.</u>, 436 U.S. 658, 694 (1978); <u>Alexander v. City of South Bend</u>, 433 F.3d 550, 557 (7th Cir. 2006). The Estate may demonstrate the existence of an unconstitutional policy or custom by showing (1) an express policy that, when enforced, caused the loss; (2) a widespread practice that constitutes a "custom or usage" that caused the loss; or (3) a person with final policymaking authority who caused the loss. <u>Walker v. Sheahan</u>, 526 F.3d 973, 977 (7th Cir. 2008).

The Estate alleges in its complaint that the violation of Mr. Pearson's rights was "caused by the implementation of a policy, custom or official act of the City of Fort Wayne," Compl., ¶ 35, but offers nothing more. The Estate hasn't identified any unconstitutional policy, custom, or official act of the City of Fort Wayne that caused the injury of which it complains; it hasn't identified any widespread pattern or series of incidents that would support its claim of an unconstitutional policy or custom; it hasn't pointed to any evidence showing that Fort Wayne police

officers violate citizens' constitutional rights so often that the need for further training was or should have been obvious to the City; nor has it established "that the City's policymakers knew that the police were using objectively unreasonable force in apprehending suspects, yet did nothing to solve the problem." <u>Dye v. Wargo</u>, 253 F.3d 296, 299 (7th Cir. 2001).

A municipality is liable for the violation of an individual's constitutional rights for failure to adequately train its officers "only when the inadequacy in training amounts to deliberate indifference to the rights of the individuals with whom the officers come into contact." <u>Jenkins v. Bartlett</u>, 487 F.3d 482, 492 (7th Cir. 2007). The Estate hasn't argued or pointed to any facts or evidence showing that any policy, custom, or official act of the City of Fort Wayne amounts to deliberate indifference to the rights of its citizens. The defendants are entitled to summary judgment on the Estate's claim of failure to train and supervise. *See* <u>Curtis v. Wilks</u>, 704 F. Supp. 2d 771, 786-787 (N.D. Ill. 2010) (the court will deem a party's claims waived for purposes of summary judgment where that party fails "to apply the law to the facts of this case in any meaningful fashion or rely on any properly supported fact statement in the summary judgment record").


### D. State Law Claims

"When all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any

supplemental state-law claims." <u>Al's Service Center v. BP Products North America</u>, Inc., 599 F.3d 720, 727 (7th Cir. 2010). "'[A] federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" <u>City of Chicago v. International College of Surgeons</u>, 522 U.S. 156, 173 (1997) (*quoting* <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 350 n.7 (1988)). Consideration of those factors shows that "[t]his case has been pending in federal court for more than eighteen months, and, having analyzed [the Estate's] federal claims at length – the factual bases for which are nearly identical to those for [the Estate's] state-law claims – the court is well familiar with the underlying facts of the remaining state-law claims. While it has no doubt that a state court could get up to speed, judicial economy favors this court continuing to exercise jurisdiction." <u>Estate of Williams v. Indiana State Police</u>, 26 F. Supp. 3d 824, 861-862 (S.D. Ind. 2014). Those factors weigh in favor of the court retaining jurisdiction of the Estate's state law claims.

*Indiana Tort Claims Act*

The Estate's state law claims are brought pursuant to the Indiana Tort Claims Act, which provides that "[a] lawsuit alleging that an employee acted within the scope of the employee's employment bars an action by the claimant against the employee personally," Ind. Code § 34-13-3-5(b), unless the complaint alleges that the employee's act was (1) criminal, (2) clearly outside the scope of the

employee's employment; (3) malicious; (4) willful and wanton, or (5) calculated to benefit the employee personally. Ind. Code § 34-13-3-5(c).

The defendants maintain the undisputed facts show that Officer Franciscy is immune from liability on the Estate's state law claims against him. "Officer Franciscy was enforcing the law when he exited his squad car to determine where the gunshot had come from, encountered [Mr.] Pearson who was armed, repeatedly ordered [Mr.] Pearson to 'show his hands' and 'drop the gun,' and discharged his firearm when [Mr.] Pearson failed to comply. Therefore, Officer Franciscy is immune from liability under Indiana Code 34-13-3-3(8)." The Estate hasn't responded to the defendants' arguments.

Police officers have immunity from Indiana tort claims, like intentional infliction of emotional distress, arising from their actions while engaged in law enforcement duties, but that immunity doesn't apply to torts such as excessive force and assault and battery. Reiner v. Dandurand, 33 F. Supp. 3d 1018, 1032 (N.D. Ind. 2014); Struck v. Town of Fishers, Ind., No. 1:11-cv-1521, 2013 WL 1149718, at *3 (S.D. Ind. Mar. 19, 2013); Wilson v. Isaacs, 929 N.E.2d 200, 203-204 (Ind. 2010). Officer Franciscy is immune from suit only on the Estate's claim for intentional infliction of emotional distress.

*Wrongful Death and Assault and Battery*

The Estate seeks damages for wrongful death under Indiana's Wrongful Death Act, IND. CODE § 34-23-1-1 (Count III), and for assault and battery (Count V) based on its allegations that Officer Franciscy's reckless conduct resulted in Mr. Pearson's death, Officer Franciscy was acting within the scope of his employment when he caused Mr. Pearson's death, and, under a theory of *respondeat superior*, the City and Officer Franciscy are jointly and severally liable for Officer Franciscy's acts. Compl., ¶¶ 38-42, 49-50.

The defendants argue that summary judgment is proper on both counts because the claims are governed by the same standards governing the Estate's Fourth Amendment excessive force claim, which they say establishes that the force employed by Officer Franciscy didn't wrongfully cause Mr. Pearson's death and didn't constitute an assault and battery. The Estate hasn't responded to the defendants' argument or provided any support for a contrary finding.

Indiana's Wrongful Death Act provides for a right to sue by a personal representative of an estate based on a decedent's death "caused by the wrongful act or omission of another." IND. CODE § 34-23-1-1. "Like the Fourth Amendment standard, Indiana law only permits a law enforcement officer to use 'reasonable' force when effectuating an arrest." Estate of Williams v. Indiana State Police, 26 F. Supp. 3d 824, 863 (S.D. Ind. 2014) (*citing* IND. CODE § 35–41–3–3(b)). Because the Fourth Amendment's "reasonableness standard" was discussed above in connection with the Estate's § 1983 excessive force claim, it won't be repeated

here. Based on the application of that standard to the facts of this case, and the Estate's failure to establish a genuine issue of material fact or cite to any relevant evidence, the court concludes that Officer Franciscy's use of deadly force was constitutionally reasonable. *See* Corley v. Rosewood Care Center, Inc. of Peoria, 388 F.3d 990, 1001 (7th Cir. 2004) (where a party fails to cite the record, court "will not root through the . . . documents . . . that make up the record here to make his case for him"); Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir. 1996) ("It is not [the court's] function to scour the record in search of evidence to defeat a motion for summary judgment."). The City of Fort Wayne and Officer Franciscy are entitled to summary judgment on the Estate's claims of wrongful death and assault and battery.

*Negligence*

In Count IV of its complaint, the Estate alleges that the damages it suffered because of Mr. Pearson's death are a direct and proximate result of the negligence of the City of Fort Wayne and the Fort Wayne Police Department. The defendants have moved for summary judgment on this claim, arguing that Mr. Pearson's own conduct bars the Estate's right to recovery.

The court in Penn Harris Madison School Corp. v. Howard, 861 N.E.2d 1190 (Ind. 2007), addressed the issue of municipal liability in negligence actions under Indiana law:

Prior to 1985, Indiana common law recognized a defense of 'contributory negligence' that barred recovery on a plaintiff's negligence claim if the plaintiff was even slightly at fault. In that year, the harsh rule of contributory negligence was substantially revised when a 'modified form of comparative fault' took effect. Although the Legislature dictated that fault could be apportioned between the plaintiff and defendant in many situations, a plaintiff was still barred from recovery if the plaintiff's own fault was greater than fifty percent. And the Legislature also specified that the provisions of the new comparative fault statute would not apply to governmental entities.

861 N.E.2d at 1193 (citations omitted). "Therefore, even a slight degree of negligence on the part of Mr. [Pearson], if proximately contributing to his claimed damages, will operate as a total bar to the [Estate's] action for damages" against the defendants. Funston v. School Town of Munster, 849 N.E.2d 595, 598 (Ind. 2006).

The defendants contend that Mr. Pearson's own actions amount to at least minimal negligence in that he didn't exercise the degree of care that an ordinarily reasonable person would exercise in like or similar circumstances. The Estate hasn't challenged the defendants' claim in this regard or cited to any facts or evidence demonstrating a genuine issue of material fact relating to Mr. Pearson's actions on the night in question. While contributory negligence is generally a question of fact not appropriate for summary judgment, "Indiana courts have found contributory negligence as a matter of law in cases in which the voluntary conduct of the plaintiff exposed him to imminent and obvious dangers which a reasonable man exercising due care for his own safety would have avoided." M.S.D. of Martinsville v. Jackson, 9 N.E.3d 230, 247-248 (Ind. Ct. App. 2014). The

undisputed facts confirm that this is just such a case: Mr. Pearson's voluntary conduct – ignoring Officer Franciscy's orders to "show your hands" and "drop your weapon," moving into a shooting stance, and pointing a gun at a police officer – exposed him to imminent and obvious danger that a reasonable man would have avoided.

Because the Estate hasn't argued or designed any facts that would support a finding that Mr. Pearson's decision to not comply with the commands of a uniformed police officer was reasonable under the circumstances of this case, the court concludes, as a matter of law, that Mr. Pearson's own proximately contributed to his death and acts as a bar to the Estate's recovery on its negligence claim. The defendants are entitled to summary judgment on Count IV of the complaint.

## Conclusion

Questions should be asked and facts should be investigated whenever a police shooting claims a life. The Estate asked questions by filing this suit. In the final analysis, though, the Estate has brought forth no evidence of facts any different from what the defendants contend: that Antron Pearson was shot to death as he brandished a handgun and refused a police officer's orders to put the gun down. Every death is tragic, but the facts of this case show that the federal constitution wasn't violated.

Based on the foregoing, the court DENIES the defendants' motion to strike [docket # 56], GRANTS the defendants' motion for summary judgment on all claims of the plaintiff's complaint [docket # 52], VACATES the final pretrial conference set for August 6, 2015 and the jury trial scheduled to commence on August 17, 2015, and DIRECTS the clerk to enter judgment accordingly.

SO ORDERED.

ENTERED:    July 20, 2015

                                    /s/ Robert L. Miller, Jr.
                                    Judge, United States District Court